# In re Dana Corp.

United States Bankruptcy Court for the Southern District of New York

May 30, 2007, Decided

Chapter 11, Case No. 06-10354 (BRL) (Jointly Administered)

**Reporter**

2007 Bankr. LEXIS 1934 *; 48 Bankr. Ct. Dec. 80; 2007 WL 1577763

In re: Dana Corporation, et al., Debtors,

**Counsel:** **[*1]** For Dana Corporation, Debtor: Corinne Ball, Pedro A. Jimenez, Richard Engman, Jones Day, New York, NY.; Robert J. Feinstein, Pachulski, Stang, Ziehl, Young, Jones & Weintraub P.C., New York, NY.; Seth T. Taube, New York, NY.

For United States Trustee, U.S. Trustee: Andrew D. Velez-Rivera, Greg M. Zipes, Office of the United States, New York, NY.

For Official Committee of Unsecured Creditors, Creditor Committee: Alan D. Halperin, Halperin Battaglia Raicht LLP, New York, NY; Matthew Williams, Paul B. O'Neill, Thomas Moers Mayer, Kramer Levin Naftalis & Frankel, LLP, New York, NY.

P. Schoenfeld Asset Management, Creditor Committee, Pro se.

For Debtors: Dean A. Ziehl, Esq., Robert J. Feinstein, Esq., Debra I. Grassgreen, Esq., Robert M. Saunders, Esq., PACHULSKI STANG ZIEHL YOUNG JONES & WEINTRAUB LLP, New York, New York.

For Goodyear Tire & Rubber Co., Creditor: Marc B. Merklin, Esq., Alan M. Koschik, Esq., BROUSE MCDOWELL L.P.A., Cleveland, Ohio.

For Goodyear Tire & Rubber Co., Creditor: Joshua J. Angel, Esq., Paul Rubin, Esq., HERRICK FEINSTEIN LLP, New York, New York.

**Judges:** Burton R. Lifland, United States Bankruptcy Judge.

**Opinion by:** Burton R. Lifland

## Opinion

Before: **[*2]** Burton R. Lifland,

United States Bankruptcy Judge

### MEMORANDUM DECISION DENYING REQUEST TO FILE LATE 503(BK9) CLAIM

The Goodyear Tire & Rubber Company ("Goodyear") moves for enlargement of time pursuant to *rule 9006(b) of the Federal Rules of Bankruptcy Procedure* (the "Bankruptcy Rules") to file claims for the sale of goods delivered during the twenty-day period immediately preceding the bankruptcy filing of the Dana Corporation and its affiliated debtor corporations (collectively, the "Debtors") on March 3, 2006 (the "Petition Date") despite the expiration of a bar date six months earlier. The Debtors and the Creditors Committee object.

### Background

Goodyear is one of the Debtors' major vendors of automotive hoses for braking, transmission, and air conditioning systems. According to Goodyear, as of Petition Date, Goodyear was owed more than $ 3.2 million by the Debtors, slightly more than the amount the Debtors' schedules reported as owing to Goodyear. Of the total claims, slightly more than half are attributable to goods Goodyear believed had been delivered to Debtors before Friday, February 10, 2006 (i.e., the last business **[*3]** day twenty days prior to the Petition Date) (the "Unsecured Claim"), while the reminder of Goodyear's claims pertained to goods delivered during the twenty-day period immediately prior to the Petition Date.

On March 8, 2006, Goodyear made a reclamation demand of $ 2,789,413.11, pursuant to *section 546(c) of title 11, United States Code* (the "Bankruptcy Code"), on account of goods delivered during the forty-five days immediately prior to the Petition Date. However, Goodyear states that it did not to pursue the reconciliation process for reclamation claims primarily because of the priority given to the new category of prepetition administrative expense claims provided for by *section 503(b)(9) of the Bankruptcy Code*, which

became effective on October 17, 2005, pursuant to the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA"). Goodyear's *section 503(b)(9)* claim (the "503(b)(9) Claim") is in the amount of $ 1,401,053.85 for goods delivered to the Debtors within three weeks of the Debtors' bankruptcy filing.

On June 28, 2006, Goodyear entered into an essential supplier agreement with the Debtors pursuant to this Court's **[*4]** order dated March 3, 2006, authorizing such agreements. In that agreement, Goodyear expressly reserved the remainder of its Unsecured Claim and its *Section 503(b)(9)* Claim. On June 30, 2006, Goodyear filed a proof of claim on account of the remaining portion of its Unsecured Claim. That proof of claim specified that Goodyear's address for service in this case was its Law Department at its corporate headquarters, 1144 East Market Street, Akron, Ohio. Goodyear had previously reached an agreement to sell this unsecured claim to J.P.Morgan. On the same day the unsecured claim was filed, a notice of assignment of the claim to J.P.Morgan was filed with the Court. Goodyear contends that it did not include its *Section 503(b)(9)* Claim with the proof of claim filed on June 30, 2006, because it was not being sold to J.P.Morgan, because it was of a higher priority pursuant to *Section 503(b)(9)*, and Goodyear was uncertain of the procedure that would be provided for filing *Section 503(b)(9)* administrative expense claims.

Also, on June 30, 2006, the Debtors filed their Schedules of Assets and Liabilities. The Debtors scheduled Goodyear with six general unsecured claims totaling $ 3,109,995 owed **[*5]** by five Different Debtors.

On July 19, 2006, this Court entered an order (the "Bar Date Order"), establishing September 21, 2006 as the last date to file proofs of claims for all prepetition claims (the "Bar Date"), including prepetition administrative expense claims under *section 503(b)(9) of the Bankruptcy Code*. The notice of the bar date (the "Bar Date Notice") specifically provided that "Claims under *section 503(b)(9) of the Bankruptcy Code* must be filed by the General Bar Date." Bar Date Notice, § 3.

The Debtors' Bar Date Notice was served between August 2-8, 2006. [1] According to the certificate of service filed by BMC, the Debtors' noticing agent, copies of the notice were mailed to several Goodyear addresses, including Goodyear's Law Department at the address that appeared on Goodyear's unsecured proof of claim filed on June 30, 2006, and that was designated as the correct address for service to Goodyear. Those notices were never returned by the United States Postal Service as undeliverable. Goodyear contends however that the Bar Date Notice was not received by Goodyear's Law Department or any other office at its headquarters. **[*6]** Goodyear also contends that its Law Department, and specifically the office of one of its associate general counsels, maintains a strict procedure for tracking the receipt of bankruptcy notices and service of process which includes forwarding all bankruptcy notices to a paralegal responsible for bankruptcy and collection matters who then ensures that they are brought to the attention of counsel. The legal department also maintains a detailed log of all notices and summonses received, including bankruptcy notices delivered to the bankruptcy and collection paralegal. That log does not include a listing of a claims bar date notice in the Debtors' cases. Moreover, Goodyear also contends that its bankruptcy paralegal has no recollection of the notice, is confident that she would have recognized the importance of a bar date notice if received, and has confirmed that no bar date notice or order appears in the file she maintains for the Debtors' cases.

**[*7]** The Debtors' certificate of service regarding the Bar Date Notice also states that notices were mailed to Goodyear's general counsel and chief executive officer. Goodyear contends that those offices routinely direct all legal process and notices concerning bankruptcies to the same associate general counsel whose office in the law department tracks legal process and who delivers bankruptcy notices to the bankruptcy and collection paralegal. Goodyear argues that office also did not receive the Bar Date Notice. Similarly Goodyear submits that its Chief Executive Officer forwards copies of bankruptcy pleadings received by his office to Damon Audia, an assistant treasurer of the company, who maintains a file for the Debtors' case as well. Upon investigation, Goodyear determined that materials were located in that file pertaining to the Debtors' cases but did not include the Bar Date Notice. Mr. Audia has no recollection of receiving the Bar Date Notice. Mr. Audia also assertedly forwards copies of legal notices in the Debtors' cases to an attorney and a financial planning director in Goodyear's Engineered Products Division, neither of whom have any recollection of the Bar Date Notice nor **[*8]** a copy of the notice in their files. On March 29, 2007, over six months after the Bar Date had passed, Goodyear filed its *503(b)(9)* Claim.

[1] In addition to the mailing, notice of the Bar Date was published in The Wall Street Journal and The Toledo Blade.

**Discussion**

The claims allowance process is an integral component of the court's equitable power to restructure debtor-creditor relationships. In re Best Prods. Co., 140 B.R. 353, 356 (Bankr. S.D.N.Y. 1992)(citations omitted); *see also* In re Hooker Invest., Inc., 937 F.2d 833, 840 (2d Cir.1991) ("[A] bar order does not function merely as a procedural gauntlet, but as an integral part of the reorganization process.") Under chapter 11 of the Bankruptcy Code, certain claimants against an estate in bankruptcy must file proofs of claim in order to participate in the reorganization. Fed. R. Bankr. P. 3003(c). After the passage of the bar date, whatever date that may be pursuant to order of the court, the claimant cannot participate in the reorganization unless he establishes sufficient grounds for the failure to file a proof of claim. *In re Best Prods. Co., Inc., 140 B.R. at 357, citing Certified* **[*9]** *Class in Charter Securities Litigation v. Charter Co. (In re Charter Co.), 876 F.2d 866 (11th Cir. 1989)*. In chapter 11, a known creditor must receive proper, adequate notice before its claim is forever barred. *In re Best Prods. Co., Inc., 140 B.R. at 357*. Thus, except when a known creditor is not listed on the schedules and hence fails to receive notice of the bar date, the bar date is strictly enforced. *Id. citing Wright v. Placid Oil Co., 107 B.R. 104, 106 (N.D. Tex. 1989)*; *see also In re Hooker Invest., Inc., 937 F.2d at 840* ("If individual creditors were permitted to postpone indefinitely the effect of a bar order . . . the institutional means of ensuring the sound administration of the bankruptcy estate would be undermined."). Only if the claimant can demonstrate excusable neglect may the court apply general principles of equity and permit a late-filed proof of claim, whether an administrative expense claim under *section 503* or a general unsecured claim under *Bankruptcy Rule 3003*. *See Pioneer Investment Services Company v. Brunswick Associates Limited Partnership, 507 U.S. 380, 382-83, 113 S. Ct. 1489, 123 L. Ed. 2d 74 (1993)*; **[*10]** *Fed. R. Bankr. P. 9006(b)(2)*. [2] The burden of proving excusable neglect is on the movant who is seeking to enlarge his time. *In re Drexel Burnham Lambert Group, Inc., 148 B.R. 1002, 1005 (S.D.N.Y. 1993)*; *In re R.H. Macy & Co., Inc., 161 B.R. 355, 360 (Bankr. S.D.N.Y. 1993)*. As the Supreme Court noted in *Pioneer,* the determination as to granting permission to file a late claim is, at bottom, an equitable one, which takes into account all of the relevant circumstances surrounding the party's failure to file timely. These factors include, (i) the danger of prejudice to the debtor; (ii) the length of the delay and its potential impact on judicial proceedings; (iii) the reason for the delay, including whether it was within the reasonable control of the movant and taking into account the movant's sophistication; and (iv) whether the movant acted in good faith. *Pioneer, 507 U.S. at 395*.

**[*11]** In the Second Circuit, however, the "*Pioneer* factors are not accorded equal weight. Typically, the length of the delay, the danger of prejudice, and the movant's good faith usually weigh in favor of the parties seeking the extension. Consequently, the Second Circuit, as well as other Circuits, focus on the reason for the delay as the predominant factor." *In re Musicland Holding Corp., 356 B.R. 603, 607 (Bankr. S.D.N.Y. 2006)*.

As cautioned by the Second Circuit however,

> We operate in an environment . . . in which substantial rights may be, and often are, forfeited if they are not asserted within time limits established by law. Judges, of course, make mistakes. We, like the district court, have considerable sympathy for those who, through mistakes-counsel's inadvertence or their own-lose substantial rights in that way. And there is, indeed, an institutionalized but limited flexibility at the margin with respect to rights lost because they have been slept on. But the legal system would groan under the weight of a regimen of uncertainty in which time limitations were not rigorously enforced-where every missed deadline was the occasion for the embarkation **[*12]** on extensive trial and appellate litigation to determine the equities of enforcing the bar.

*Midland Cogeneration Venture Ltd. v. Enron Corp. (In re Enron Corp.), 419 F.3d 115, 123 (2d Cir. 2005)*.

Goodyear argues that the reason for the delay in filing its *503(b)(9)* Claim is because it did not receive the Bar Date Notice. Goodyear agrees that the Certificate of Mailing reflects that the Bar Date Notice was mailed to Goodyear at the address designated by Goodyear as the correct address for service and addressed to the attention of the appropriate department. In addition,

---

[2] *Bankruptcy Rule 9006(b)(1)* provides in relevant part that the court for cause shown may at any time in its discretion on motion made after the expiration of the specified period permit the act to be done where the failure to act was the result of excusable neglect.

BMC, the Debtors' claims and noticing agent, mailed an additional twenty Bar Date Notices to Goodyear. Goodyear contends they were never received.

Courts uniformly presume that an addressee receives a properly mailed item when the sender presents proof that it properly addressed, stamped, and deposited the item in the mail. *See In re R.H. Macy Co., Inc., 161 BR 355, citing Hagner v. United States, 285 U.S. 427, 430, 52 S. Ct. 417, 76 L. Ed. 861 (1932)* ("the rule is well settled that proof that a letter properly directed was placed in a post office creates a presumption that it reached its **[*13]** destination in usual time and was actually received by the person to whom it was addressed"); *see also Leon v. Murphy, 988 F.2d 303, 309 (2d Cir. 1993)* (finding, under New York law, that when sender "presents proof of office procedure followed in a regular course of business, and these procedures establish that the required notice has been properly addressed and mailed," a presumption of receipt arises).

While the presumption is a rebuttable one, it is a very strong presumption and can only be rebutted by specific facts and not by invoking another presumption and not by a mere affidavit to the contrary. *See In re Borchert, 143 B.R. 917, 920 (Bankr. D.N.D. 1992) citing Arkansas Motor Coaches Ltd., Inc., 198 F.2d 189, 191 (8th Cir. 1952)*. Some courts require clear and convincing evidence to overcome the presumption of delivery. *See Moody v. Bucknum (In re Bucknum), 951 F.2d 204, 207 (9th Cir. 1991)* ("The presumption can only be overcome by clear and convincing evidence that the mailing was not, in fact, accomplished."). Evidence of an objective nature going beyond the claimant's statement of non-receipt is necessary. **[*14]** *CUNA Mutual Ins. Group v. Williams (In re Williams), 185 B.R. 598, 600 (9th Cir. BAP 1995)* (evidence of business routine regarding receipt of mail not sufficient; more positive evidence such as testimony of a clerk's office employee that notice was not sent or proof that none of the listed creditors received notice or that the mail was returned unclaimed.); *In re Chicago P'ship Bd. Inc., 236 B.R. 249, 256 (Bankr. N.D. Ill. 1999)* (the presumption that the addressee of a properly addressed and mailed notice receives that notice may be rebutted by "direct" and "substantial" evidence); *Ms. Interpret v. Rawe Druck-Und-Veredlungs-GMBH (In re Ms. Interpret), 222 B.R. 409, 413 (Bankr. S.D.N.Y. 1998)* (a party must do more than merely assert that it did not receive the mailing; its testimony or affidavit of non-receipt is insufficient, standing alone, to rebut the presumption.); *Dependable Insurance Co. v. Horton (In re Horton), 149 B.R. 49, 58 (Bankr. S.D.N.Y.1992)* (finding that an addressee did not rebut the presumption of receipt as it did not present evidence that, because of the incomplete address, the postal service could **[*15]** not deliver the notice of bankruptcy to its post office box and further, its affidavits denying receipt, "[stood] merely as general denials" and were insufficient to rebut the presumption); *In re STN Enterprises, Inc., 94 B.R. 329, 335 (Bankr. D. Vt. 1988)* ("the combination of the facts that the address was only 'slightly incorrect,' the notice was never returned to debtor's attorney as undelivered, and that [the creditor] had received other mailings from debtor's attorney at the incorrect address lead us to conclude that the [creditor received the] notice of the bar date.").

Here, Goodyear has failed to overcome the presumption of receipt. Goodyear failed to demonstrate that the Bar Date Notice was not mailed nor that there was any deficiency in the address or mailing process. Despite Goodyear's attempts to trace its receipt of mail and forwarding procedures, I find it incredulous that of 21 Bar Date Notices mailed, including Notices sent to Goodyear's general counsel and chief executive officer, Goodyear failed to receive even one. *See North American Car Corp. v. Peerless Weighing & Vending Mach. Corp., 143 F.2d 938, 940-41 (2d Cir. 1944)* **[*16]** ("at least four notices of various forms were sent to its treasurer, Johnson, at its Chicago address. The inference that not all of these communications failed of arrival is rather violent . . . it seems more probable that the presently important details of these communications were overlooked, rather than that they were not received at all."); *In re Robinson, 228 B.R. 75, 83 (Bankr. E.D.N.Y.1998)* ("It is highly unlikely that two properly addressed notices, one sent to Pennsylvania and the other to North Carolina, were both lost in the mail."); *In re Borchert 143 B.R. at 920* ("it is incredulous to think that four letters sent by two different people were not received by two different intended recipients. An affidavit suggesting non-receipt of a single letter by a single recipient might be worthy of belief but for two separate entities to both claim to have no record of receiving the letters is a rather convenient defense at this late date").

Goodyear's argument that it should also be excused for failing to file timely because the *503(b)(9)* Claims were a new breed of claim is meritless. The *503(b)(9)* claims are prepetition claims and were clearly provided **[*17]** for in the Bar Date Notice. The face of the proof of claim forms even had a separate box and checkbox for *section 503(b)(9)* claims and accompanying instructions. Goodyear filed its Unsecured Claims even before the

Bar Date was set. Although it was well aware of its 503(b)(9) Claim, Goodyear admits that "[b]ecause the market for Section 503(b)(9) Claims was not sufficiently attractive, Goodyear held those claims . . ." Clearly Goodyear is a highly sophisticated creditor who initially chose not to file its 503(b)(9) Claim for business reasons. Although Goodyear asserts it was waiting further instructions, it failed to check the docket for such instructions for more than six months after the Bar Date and eight months after the Bar Date Order was entered. *See, i.e., Joslin v. Wechsler (In re Wechsler), 246 B.R. 490, 495 (S.D.N.Y. 2000)* (reason for delay weighs against party where he failed to check the docket for weeks). Once the Bar Date Order was entered, a simple review of the docket would have revealed the date and the type of claims that were covered. In fact, according to Goodyear such a review did finally reveal that information.

Contrary to Goodyear's **[*18]** assertion, its six-month delay is not excusable. *See In re Enron Corp. 419 F.3d at 125 (Cir. 2005)* (delay of more than six months after that date was "substantial,"). While the Debtors have not yet filed their plan, the process is well underway in light of the stringent time lines under BAPCPA. The strict bar date provided by this Court was intended, in part, to facilitate the equitable and orderly intake of claims and enable the Debtors to understand the universe of liabilities in connection with plan negotiations and formation. In this Circuit, whether a claim is submitted before the date on which a reorganization plan is filed ordinarily will not be conclusive. "Magnifying the importance of that date necessarily minimizes the importance of the bar date, and fails to recognize adequately the practical centrality to bankruptcy reorganizations of negotiations among creditors and debtors." *In re Enron Corp., 419 F.3d at 129*; *see also In re Kmart Corp., 381 F.3d 709, 713 (7th Cir. 2004)* (affirming the disallowance of a late-filed claim notwithstanding the fact that the debtor was "on full notice of [the creditor's] claim and could **[*19]** have easily taken it into account when it drafted its reorganization plan").

Lastly, allowing Goodyear's 503(b)(9) Claim would prejudice the Debtor. First, as an administrative claim, it is a substantial claim. Second, the floodgates argument is a viable one. There are close to 15,000 claims filed in the Debtors' cases, more than 800 of which were filed after the Bar Date. Granting the requested relief to Goodyear, a creditor who was well aware of its claim, was mailed 21 Notices of the Bar Date, filed other claims and has actively participated in these cases would set an untenable precedent and would likely precipitate a flood of similar claims. *See In re Enron, 419 F.3d at 130*; *In re Kmart, 381 F.3d at 709*.

Accordingly, for the reasons set forth above, the motion to file the late 503(b)(9) Claim is denied.

IT IS SO ORDERED.

Dated: New York, New York

May 30, 2007

/s/ Burton R. Lifland

United States Bankruptcy Judge

---

**End of Document**

# Criollo v. Ny Fine Interiors

United States District Court for the Eastern District of New York

March 3, 2021, Decided; March 3, 2021, Filed

19 CV 5794 (EK) (CLP)

**Reporter**

2021 U.S. Dist. LEXIS 64632 *

MARCO CRIOLLO, Plaintiff, -against- NY FINE INTERIORS INC., et al., Defendants.

**Subsequent History:** Adopted by, Motion denied by *Criollo v. Ny Fine Interiors, 2021 U.S. Dist. LEXIS 61802, 2021 WL 1193082 (E.D.N.Y., Mar. 30, 2021)*

Magistrate's recommendation at *Criollo v. NY Fine Interiors Inc., 2021 U.S. Dist. LEXIS 252901 (E.D.N.Y., Nov. 2, 2021)*

**Counsel: [*1]** For Marco Criollo, Plaintiff: Robert Wisniewski, Robert Wisniewski & Associates P.C., New York, NY.

For NY Fine Interiors Inc., NY Fine Interiors & Woodwork Inc., Damian Cejnog, Defendants: Karl J. Silverberg, LEAD ATTORNEY, Silverberg, P.C., Central Islip, NY.

**Judges:** Cheryl L. Pollak, Chief United States Magistrate Judge.

**Opinion by:** Cheryl L. Pollak

## Opinion

**REPORT AND RECOMMENDATION**

**POLLAK**, Chief United States Magistrate Judge:

On April 17, 2019, plaintiff Marco Criollo commenced this action against defendants NY Fine Interiors, Inc. ("NY Fine Interiors"), NY Fine Interiors & Woodwork Inc. ("Interiors & Woodwork") (the "corporate defendants"), and defendant Damian Cejnog (collectively, "defendants"), alleging violations of the Fair Labor Standards Act ("FLSA"), *29 U.S.C. §§ 201 et seq.*, Articles 6 and 19 of the New York Labor Law ("NYLL"), and the various wage orders promulgated thereunder and codified at 12 N.Y.C.R.R. §§ 135-146. Plaintiff alleges that defendants failed to pay overtime rates for all hours worked over 40 in a week, failed to provide a wage notice and wage statements in compliance with NYLL *§§ 195.1* and 195.3, and terminated plaintiff's employment in retaliation for his complaints about the manner in which he was paid.

Despite service of the Summons and Complaint **[*2]** on the two corporate defendants through service on an agent of the Secretary of State of New York (see ECF Nos. 7, 8), and service on defendant Cejnog and Interiors & Woodwork on November 7, 2019 (see ECF Nos. 9, 10) - as discussed in depth below — defendants failed to file an Answer or otherwise move with respect to the Complaint. Accordingly, on February 2, 2020, plaintiff filed a request seeking to have the Clerk enter default, which was noted on February 6, 2020.

On June 1, 2020, plaintiff filed his motion for default judgment, seeking unpaid wages, overtime wages, liquidated damages, interest, statutory damages based on the wage notice violations, and damages based on plaintiff's claim of retaliation. On June 3, 2020, the motion for default judgment was referred to the undersigned by the Honorable Eric Komittee to prepare a Report and Recommendation.

On June 19, 2020, defendants appeared through counsel and requested additional time to respond. The Court granted this request for an extension, along with other requests, including an extension requested to allow the parties to engage in settlement discussions. On August 12, 2020, defendants filed their opposition to plaintiff's motion **[*3]** for default judgment, arguing that the default was not willful, that Damian Cejnog "never received actual knowledge of the summons and complaint," and that defendants had a meritorious defense. On August 19, 2020, plaintiff filed his reply. Thereafter, on August 26, 2020, defendants sought permission to file a Sur-Reply in response to certain assertions made in plaintiff's Reply, including *inter alia*, an accusation that defendants had offered into evidence "documents which have been doctored and/or created in lieu of records they were obligated to maintain by law."

(Pl.'s Reply[1] at 9). On December 16, 2020, the Court granted the request to file a Sur-Reply and set a hearing on the issue of service and defendants' motion to set aside the default. (See Electronic Order and Electronic Scheduling Order, dated December 16, 2020).

On January 14, 2021, the undersigned held a hearing on the issue of the adequacy of service. The hearing was then continued on February 2, 2021, and additional witnesses testified. (See ECF Nos. 46, 47). At the conclusion of the hearing, the parties were given an additional three weeks to supplement the record. (See Minute Entry, dated February 4, 2021). Defendants **[*4]** then requested and were given an extension until March 1, 2020 to supplement the record. (See Electronic Order, dated February 19, 2021). Both parties filed additional affidavits supplementing the record. (See ECF No. 49-51, 53). Finally, the parties requested to file post-hearing briefs. (ECF No. 52).

Now that the time to supplement the record has concluded, the undersigned respectfully recommends that the court deny plaintiff's motion for default judgment and set aside the default. The Court also denies the parties' motion to file additional briefs.

FACTUAL BACKGROUND

Plaintiff alleges that the corporate defendant NY Fine Interiors Inc. is a New York domestic corporation, with its principal place of business located at 43-12 54th Road, Maspeth, New York 11378. (Compl.[2] ¶ 3). Defendant NY Fine Interiors & Woodwork Inc. is also a New York domestic corporation, with its principal place of business located at 163-53 84th Street, Howard Beach, New York 11414. (Id. ¶ 4). According to the Complaint, defendant Damian Cejnog is the owner, member, major shareholder, officer, director, and/or manager of both corporate defendants and individually responsible for unpaid wages pursuant to New York **[*5]** Business Corporation Law. (Id. ¶¶ 5, 6). Plaintiff alleges that the defendants are contractors engaged in the business of manufacturing and installing "upmarket custom-made cabinetry and woodwork," whose activities affect interstate commerce and who have an annual sales volume of not less than $500,000. (Id. ¶¶ 8, 13).

Plaintiff alleges that in or around the beginning of June 2018, he entered into an oral contract with defendants in which he agreed to work as a cabinet maker in the defendants' Maspeth shop in exchange for an hourly rate of $30 per hour. (Id. ¶ 14). Plaintiff claims that he worked for defendants from the beginning of June 2018 until February 14, 2019. (Id. ¶ 15). Plaintiff alleges that he regularly worked six days a week, Monday through Saturday, from 7:00 a.m. until 5:00 p.m., with a half hour lunch break, for a total of 57 hours per week. (Id. ¶ 16).

According to the Complaint, plaintiff was paid bi-weekly through two checks: one check was issued by Interiors & Woodwork, reflecting plaintiff's pay as $14.00 per hour; the second check was issued by NY Fine Interiors, reflecting the difference between $14.00 an hour and the $30.00 an hour which was the agreed-upon rate **[*6]** of pay. (Id. ¶ 17). Plaintiff asserts that the second check was issued to "cash" and never included a pay stub. (Id.) Plaintiff further alleges that for the first month of his employment, defendants only paid him $24 an hour, despite their oral agreement, and began paying the $30 per hour in July, but only after Criollo threatened to leave their employment. (Id. ¶ 18). Plaintiff also alleges that despite regularly working over 40 hours per week, he was never paid overtime for the hours worked in excess of 40 per week. (Id. ¶ 19). Finally, plaintiff alleges that he never received wage notices as required by law. (Id. ¶ 20). Plaintiff claims that he complained to the defendants that he was being paid "off the books" and not properly compensated for the overtime hours he worked. (Id. ¶ 22). According to plaintiff, approximately one week after making these complaints to defendant Cejnog, plaintiff was terminated in retaliation. (Id. ¶ 24).

Plaintiff brings claims for unpaid minimum and overtime wages under the FLSA and NYLL, claims for wage statement and wage notice violations in violation of the NYLL, and for retaliation under both the FLSA and NYLL.

Following the filing of the Complaint **[*7]** on April 17, 2019, defendants failed to file an Answer or otherwise move with respect to the Complaint. A default was entered against defendants on February 6, 2020. This motion for default judgment was filed on June 1, 2020.

On August 12, 2020, defendants opposed the motion for default. (See ECF Nos. 24-26). Defendants requested that the Court deny plaintiff's motion for default based on defendants' reasonable excuse and lack of willfulness in failing to answer the Summons and

[1] Citations to "Pl.'s Reply" refer to Plaintiff's Reply Memorandum of Law in Support of Plaintiff's Motion for Default Judgment, filed August 19, 2020, ECF No. 27.

[2] Citations to "Compl." refer to the plaintiff's Class Action Complaint, filed on October 14, 2019, ECF No. 1.

Complaint, and based on defendants' meritorious defense. (Defs.' Mem.[3] at 2). Defendants alleged that Mr. Cejnog addressed plaintiff's motion for default judgment "as soon as he obtained actual knowledge of the plaintiff's motion papers. Damian Cejnog, however, never received actual knowledge of the summons and complaint in this action." (Id.) Mr. Cejnog submitted an affidavit in which he explained that his office — located in Maspeth and the address on record with the Secretary of State for NY Fine Interiors — was inundated with junk mail (Cejnog Decl. ¶ 6(a)), and that his home address in Howard Beach — the address on record with the Secretary of State for Interiors & Woodwork — was undergoing renovations during **[*8]** November 2019. (Cejnog Decl. ¶ 6(b)). As such, Mr. Cejnog stated that he never received the Summons and Complaint, but immediately responded to the motion for default judgment upon becoming aware of it. (Id. ¶ 5).

The Court scheduled a hearing on the adequacy of service for December 16, 2020. The hearing consisted of two parts — one on January 14, 2021, the other on February 2, 2021. Two witnesses appeared on behalf of the plaintiff. First, Jay Brodsky, president of ABC Process Service Bureau, testified as to the procedures observed by his company in serving process upon Mr. Cejnog and Interiors & Woodwork on November 7, 2019. (1/14/2021 Tr. at 11-42). Mr. Brodsky explained that his process servers are licensed and required to maintain an electronic record of every service that they effectuate. (Id. at 17-18). As such, each process server takes a photograph of the location he or she is supposed to serve through an application that stamps the photograph with both the GPS coordinates and the time. (Id. at 18). The actual process server, Mohamed Elgizawy, also testified. (Id. at 46). Mr. Elgizawy confirmed that on November 7, 2019, he served the Summons and Complaint at the Howard Beach location. He took a photograph **[*9]** of the Cejnogs' Howard Beach residence, then proceeded to hand the Summons and Complaint to the woman who answered the front door. (Id. at 49-50). According to Mr. Elgizawy, the woman who answered the door identified herself as Mr. Cejnog's wife and confirmed that Mr. Cejnog lived there. (Id. at 50).

At the continuation of the hearing on February 2, 2021, defendants' witnesses were called. Joanna Cejnog, Damien Cejnog's wife, testified that she and her family were living at a Ridgewood, Queens apartment during November 2019 - not at the Howard Beach house. (2/2/2021 Tr. at 6). She also testified that she drove her husband to the airport on November 7, 2019, leaving the Ridgewood apartment at 6:30 p.m. and that she was not at home when the process server claims to have delivered the Summons and Complaint. (Id. at 14). Damian Cejnog also testified that they were living in the Ridgewood apartment in November 2019. (Id. at 27). He testified to the extent of the renovations, about his flight on the evening of November 7, 2019, and his first awareness of this case on June 19, 2020. (Id. at 27-41).

Defendants also supplemented the hearing exhibits with three additional affidavits, from Damian Cejnog; Ireneusz "Eric" Cejnog, Damian Cejnog's **[*10]** cousin; and Jeruy Gorski, owner of A&J Remodeling & Renovation Corp., as to the renovations at the Howard Beach residence. (See ECF Nos. 49, 50, 51). On March 2, 2021, plaintiff Criollo submitted a responsive declaration challenging the statements made in defendants' submissions. (ECF No. 53).

## DISCUSSION

A. Motion for Default Judgment — Standards

*Rule 55(a) of the Federal Rules of Civil Procedure* provides that "[w]hen a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend, and that failure is shown by affidavit or otherwise, the clerk must enter the party's default." *Fed. R. Civ. P. 55(a)*. *Rule 55* sets forth a two-step process for an entry of default judgment. See *Enron Oil Corp. v. Diakuhara, 10 F.3d 90, 95-96 (2d Cir. 1993)*. First, the Clerk of Court enters the default pursuant to *Rule 55(a)* by notation of the party's default on the Clerk's record of the case. See id. Second, after the Clerk of Court enters a default against a party, if that party fails to appear or otherwise move to set aside the default pursuant to *Rule 55(c)*, the court may enter a default judgment. See *Fed. R. Civ. P. 55(b)*.

Providing guidance as to when a default judgment is appropriate, the Second Circuit has cautioned that since a default judgment is an extreme remedy, it should only be entered as a last resort. See *Meehan v. Snow, 652 F.2d 274, 277 (2d Cir. 1981)*. While the Second Circuit **[*11]** has recognized the "push on a trial court to dispose of cases that, in disregard of the rules, are not processed expeditiously [and] . . . delay and clog its calendar," it has held that the district court must balance that interest with its responsibility to "[afford] litigants a

[3] Citations to "Defs.' Mem." refer to the Defendants' Memorandum of Law in Opposition to Plaintiff's Motion for a Default Judgment, filed on August 12, 2020, ECF No. 26.

reasonable chance to be heard." *Enron Oil Corp. v. Diakuhara, 10 F.3d at 95-96*. Thus, in light of the "oft-stated preference for resolving disputes on the merits," default judgments are "generally disfavored," and doubts should be resolved in favor of the defaulting party. Id. Accordingly, plaintiffs are not entitled to a default judgment as a matter of right simply because a party is in default. See *Erwin DeMarino Trucking Co. v. Jackson, 838 F. Supp. 160, 162 (S.D.N.Y. 1993)* (noting that courts must "supervise default judgments with extreme care to avoid miscarriages of justice").

The Court has significant discretion to consider a number of factors in deciding whether to grant a default judgment, including: (1) whether the grounds for default are clearly established; (2) whether the claims were pleaded in the complaint, thereby placing the defendants on notice, see *Fed. R. Civ. P. 54(c)* (stating "[a] default judgment must not differ in kind from, or exceed in amount, what is demanded in the pleadings"); *King v. STL Consulting LLC, No. 05 CV 2719, 2006 U.S. Dist. LEXIS 72116, 2006 WL 3335115, at *4-5 (E.D.N.Y. Oct. 3, 2006)* (holding that *Rule 54(c)* is not violated in awarding **[*12]** damages that accrued during the pendency of a litigation, so long as the complaint put the defendant on notice that the plaintiff may seek such damages); and (3) the amount of money potentially involved — the more money involved, the less justification for entering the default judgment. *Hirsch v. Innovation Int'l, Inc., No. 91 CV 4130, 1992 U.S. Dist. LEXIS 15882, 1992 WL 316143, at *2 (S.D.N.Y. Oct. 19, 1992)*. Additionally, the Court may consider whether material issues of fact remain, whether the facts alleged in the complaint state a valid cause of action, whether plaintiffs have been substantially prejudiced by the delay involved, and whether the default judgment might have a harsh effect on the defendants. See *Pacific M. Int'l Corp. v. Raman Int'l Gems, Ltd., No. 10 CV 9250, 888 F. Supp. 2d 385, 2012 WL 3194968, at *5 (S.D.N.Y. Aug. 7, 2012)*.

The burden is on the plaintiffs to establish their entitlement to recovery. See *Greyhound ExhibitGroup, Inc. v. E.L.U.L. Realty Corp., 973 F.2d 155, 158 (2d Cir. 1992)*, cert. denied, *506 U.S. 1080 (1993)*. When a default judgment is entered, the defendants are deemed to have admitted all well-pleaded allegations in the complaint pertaining to liability. Id. For the purposes of an inquest, a court accepts as true all factual allegations in the complaint, except those claims relating to damages. See *Au Bon Pain Corp. v. Artect, Inc., 653 F.2d 61, 65 (2d Cir. 1981)*.

Pursuant to *Rule 55(c)*, the Court may set aside an entry of default for good cause. The standard for setting aside the entry of a default pursuant to *Rule 55(c)* is less rigorous than the "excusable neglect" standard for setting **[*13]** aside a default judgment by motion pursuant to *Rule 60(b)*. *Meehan v. Snow, 652 F.2d 274, 276 (2d Cir. 1981)*. The main factors for the Court to consider in determining the appropriateness of relieving a party of a default are whether the default was willful, whether setting it aside would prejudice the adversary, and whether a meritorious defense is presented. *Enron Oil Corp. v. Diakuhara, 10 F.3d at 96*; *Meehan v. Snow, 652 F.2d at 277*. Other relevant equitable factors may also be considered, for instance, whether the failure to follow a rule of procedure was a mistake made in good faith and whether the entry of default would bring about a harsh or unfair result. Id. The party seeking relief from an entry of default bears the burden of proof. *Aetna Life Ins. Co. v. Licht, No. 03 CV 6764, 2004 U.S. Dist. LEXIS 21538, 2004 WL 2389824, at *3 (S.D.N.Y. Oct. 25, 2004)* (quoting *In re Martin-Trigona, 763 F.2d 503, 505 n. 2 (2d Cir. 1985)*). As discussed above, however, defaults are not favored and doubts are to be resolved in favor of a trial on the merits. *Meehan v. Snow, 652 F.2d at 277*.

Finally, "where service of process is insufficient, the court has no power to render judgment and the judgment is void." *In re Worldwide Web Systems, Inc., 328 F.3d 1291, 1299 (11th Cir. 2003)*. "Once a defendant challenges the sufficiency of service of process, the burden of proof is on the plaintiff to show the adequacy of service." *Lian Qing Yu v. 58 Asian Corp., No. 16-CV-7590 (AJN), 2018 U.S. Dist. LEXIS 45637, 2018 WL 1415214, at *1 (S.D.N.Y. Mar. 20, 2018)*, citing *Commer v. McEntee, 283 F. Supp. 2d 993, 997 (S.D.N.Y. 2003)*.

In this case, it is clear that defendants are in default; they did not file an Answer, nor did they respond to the Complaint in any way. However, upon receiving the papers in **[*14]** connection with plaintiff's motion for default judgment, defendants have now appeared and argue that a default judgment should not enter at this time.

B. Analysis

1. Service of Process

In moving to set aside the default, defendants argue that they never received proper service of the Summons and Complaint, and therefore had no knowledge of the lawsuit until Mr. Cejnog received the papers filed in

connection with the default judgment.

Plaintiff has submitted affidavits of service demonstrating that on October 28, 2019, he served both NY Fine Interiors and Interiors & Woodwork by service upon the Secretary of State of New York, pursuant to *Sections 306*, *306-A*, and *307* of the New York Business Corporation Law. (Wisniewski Decl.[4] ¶ 6, Ex. 2). Plaintiff has also submitted an affidavit of service showing that defendant Cejnog was served on November 7, 2019, by substituted service pursuant to *CPLR § 308 (2)*. (Id. ¶ 8, Ex. 3). Damian Cejnog, however, claims that he never received actual knowledge of the Summons and the Complaint in this action. (Defs.' Mem. at 2).

Personal jurisdiction is a necessary prerequisite to entry of a default judgment. If a defendant does not receive service in compliance with *Rule 4 of the Federal Rules of Civil Procedure* and does not waive formal **[*15]** service, the court lacks personal jurisdiction over the defendant. See *Martin v. New York State Dep't of Mental Hygiene, 588 F.2d 371, 373 (2d Cir. 1978)*; see also *Michaelson v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 709 F. Supp. 1279, 1282 (S.D.N.Y. 1989)* (stating that proper service on a defendant of a summons and complaint is a prerequisite to personal jurisdiction).

*Rule 4 of the Federal Rules of Civil Procedure* prescribes the manner in which service of process must be effected in order to subject a defendant to the court's jurisdiction. See *Fed. R. Civ. P. 4*. Thus, it is well established that failure to adequately prove proper service of court documents under *Rule 4* bars the entry of a default judgment. See, e.g., *Orellana v. World Courier, Inc., No. 09 CV 576, 2010 U.S. Dist. LEXIS 88895, 2010 WL 3861002, at *2 (E.D.N.Y. Aug. 24, 2010)* (denying motion for default judgment against a defendant for whom plaintiff had not adequately proved service); *Cowder v. Admin. for Children & Families, No. 09 CV 628, 2010 U.S. Dist. LEXIS 17915, 2010 WL 723440, at *2 (E.D.N.Y. Mar. 1, 2010)* (denying motion for default judgment where service had not been properly effected); *Llaviganay v. Cipriani 110 LLC, No. 09 CV 737, 2009 U.S. Dist. LEXIS 37052, 2009 WL 1044606, at *1 (S.D.N.Y. Apr. 14, 2009)* (noting that inadequate proof of service bars entry of default judgment). Here, the defendants have not indicated any intention to waive service; thus, the issue is whether all necessary documents have been served in compliance with the requirements of *Rule 4*.

Under the Federal Rules of Civil Procedure, a natural person may be served by "following state law for serving a summons . . . in the state where the district court is located" or by "leaving a copy of the [pleadings] at the individual's dwelling or usual place **[*16]** of abode with someone of suitable age and discretion who resides there." *Fed. R. Civ. P. 4(e)(1)*, *(e)(2)(B)*. *Rule 4* also provides that service may be affected by "following state law . . . [of] the state where the district court is located." *Fed. R. Civ. P. 4(e)(1)*. New York provides for service upon an individual by delivering the summons and complaint to "a person of suitable age and discretion at the actual place of business, dwelling place or usual place of abode . . ." to be followed by mailing a copy to the individual's "last known residence." *N.Y. C.P.L.R. § 308*. Thus, in this case, service under *Rule 4* may also be deemed proper if plaintiff has complied with New York law.

*Federal Rule of Civil Procedure 4(h)* provides that service on a corporation may proceed in two ways. A plaintiff may deliver a copy of the summons and complaint to an officer, managing or general agent, or "any other agent authorized by appointment or by law to receive service." *Fed. R. Civ. P. 4(h)(1)(B)*. A plaintiff may also serve a corporation "in the manner prescribed by *Rule 4(e)(1)* for serving an individual[,]" which allows for service according to state law in which the federal district court is located or where service is made. *Fed. R. Civ. P. 4(h)(1)(A)*; 4(e)(1). Under New York law, a corporation can be served through "an officer, director, managing or general agent, or cashier or **[*17]** assistant cashier or to any other agent authorized by appointment or by law to receive service." *N.Y. C.P.L.R. § 311(a)(1)*. Moreover, *CPLR § 311(a)(1)* recognizes that an agent for service on a corporation includes the Secretary of State of New York under *N.Y. Bus. Corp. Law §§ 306* and *307*. *Baker v. Latham Sparrowbush Assocs., 72 F.3d 246, 254 (2d Cir. 1995)* ("New York designates the Secretary of State as agent for service of process for all corporations").

The technical requirements of *Rule 4* notwithstanding, courts have recognized that the fundamental purpose of service is to give defendants notice of the claims against them; due process requires that service be "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *DPWN Holdings (USA), Inc. v. United Air Lines, 871 F.*

[4] Citations to "Wisniewski Decl." refer to the Declaration of Robert Wisniewski, Esq. in Support of Plaintiff's Motion for Default Judgment, dated June 1, 2020, ECF No. 17.

Supp. 2d 143, 154 (E.D.N.Y. 2012) (citing Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306, 314, 70 S. Ct. 652, 94 L. Ed. 865 (1950)). At its core, this standard is one of reasonableness. Id. Thus, courts will deem valid efforts to serve outside the bounds of Rule 4 where a defendant has "actual notice" of the documents mailed. See, e.g., Burda Media, Inc. v. Blumenberg, No. 97 CV 7167, 2004 U.S. Dist. LEXIS 8804, 2004 WL 1110419, at *6-*7 (S.D.N.Y. May 18, 2004).

On August 12, 2020, defendant Cejnog submitted a Declaration in Opposition to plaintiff's motion for default judgment, claiming that he first became aware of the lawsuit on June 19, 2020 when he "found the envelope with the Motion for Default on a workbench in my company's shop in Maspeth, **[*18]** New York." (Cejnog Decl.[5] ¶ 5). According to Mr. Cejnog, he immediately, "within five minutes of finding the documents," informed his attorney, who asked for more time to respond. (Id.) Mr. Cejnog asserts that he never received the Summons and Complaint, and never had any communication from plaintiff's attorney prior to receiving the motion for default judgment. (Id. ¶ 6).

He claims that NY Fine Interiors is located at 43-12 54th Road in Maspeth, which is where his office is located. (Id.) His employees bring in the daily mail delivery to him in the office, but he has instructed them to discard the junk mail. (Id. ¶ 6(a)). He speculates that an employee discarded the Summons and Complaint, not knowing that it was not junk mail. (Id.)

According to Mr. Cejnog, the Howard Beach address, which is listed with the Secretary of State as the service address for Interiors & Woodwork, is his home address. (Id. ¶ 6(b)). Mr. Cejnog represents that between August 2019 and December 2019, he and his family moved to an apartment in Ridgewood, Queens while his Howard Beach home was undergoing renovation. (Id.) Since plaintiff served the Summons and Complaint upon Interiors & Woodwork at that address through **[*19]** the Secretary of State on October 28, 2019, and also served Mr. Cejnog personally at that address during the period he was not living there, he speculates that "in the disarray of my temporary living conditions, the Summons and Complaint just never reached me." (Id.) He asserts that he "would never disregard a summons and complaint," and avers that as soon as he became aware of the Motion for Default Judgment, he contacted his attorney. (Id. ¶ 6(c)). He further claims that in March 2019, he received a communication from a paralegal about monies owed to Mr. Criollo and he asserts that he promptly returned the call and tried to deal with the issue. (Id. ¶ 6(d)). He asserts that if he had received actual notice of the Summons and Complaint, he would have responded: "I would never disregard a summons and complaint." (Id. ¶ 6(c), (e)).

As discussed above, the Court held a hearing on the issues of service on January 14, 2021 and February 2, 2021. Despite defendant Cejnog's assurance that he did not receive the Summons and Complaint, the record raises doubts as to his claim. First, defendants NY Fine Interiors and Interiors & Woodwork were both served via the New York Secretary of State.[6] ( **[*20]** See ECF Nos. 7, 8). According to the Secretary of State's website, NY Fine Interiors' address for service of process is listed as 43-12 54th Road in Maspeth, while Interiors & Woodwork's address for service is listed as Mr. Cejnog's Howard Beach address. Since plaintiff has provided affidavits of service showing service through the Secretary of State at both Mr. Cejnog's business and residential addresses, defendants should have received notice of this lawsuit.

In addition, plaintiff has presented evidence showing that Mr. Cejnog and Interiors & Woodwork were also served on November 7, 2019, through personal service at the Howard Beach address by a process server retained by plaintiff's counsel. Although the affidavit of service does not provide the name of the individual who was served at the Howard Beach address, the process server, Mohaned Elgizawy, testified at the hearing before this Court that he served Mr. Cejnog's wife at the Howard Beach home address. (1/14/2021 Tr. at 50). To corroborate the testimony of the process server, plaintiff introduced Exhibit 6 into the record. (See ECF No. 38-6). Exhibit 6 is a photograph taken by the process server on November 7, **[*21]** 2019, depicting the house the process server claims to have served. (Id.) The photograph includes both a time stamp, showing the photograph was taken at 7:05 p.m. on November 7, 2019, which is when the process server testified he effected service, and the GPS coordinates of the house. (Id.) The GPS coordinates correspond to the defendant's Howard Beach home address, which is also

---

[5] Citations to "Cejnog Decl." refer to the Declaration of Damian Cejnog in Opposition to plaintiff's motion for default judgment, dated August 12, 2020, ECF No. 24.

[6] Defendants do not seem to contest that the corporate defendants were properly served. (See Defs.' Mem. at 2, stating only that "*Damian Cejnog* . . . never received actual knowledge" of the Complaint (emphasis added)).

the address listed with the Secretary of State for service on Interiors & Woodwork. (Id.)

The plaintiff also presented the testimony of Jay Brodsky, the president of the company responsible for serving process in this case, ABC Process Service Bureau. Mr. Brodsky assured the Court that the photograph and GPS coordinates accurately depict when and where the photograph was taken. (1/14/2021 Tr. at 18, 41). From the evidence, it appears that Mr. Elgizawy, an experienced process server, went to defendant's Howard Beach residence on November 7, 2019 at 7:05 p.m., consistent with his affidavit of service.

Defendants, however, dispute that Mr. Cejnog's wife was served with the Summons and Complaint, claiming that Mr. Cejnog and his wife were not living at the Howard Beach residence in November of 2019. Both Damian **[*22]** and Joanna Cejnog testified that the Howard Beach residence was undergoing renovations at that time and defendants presented photographs showing a bathroom under construction. (2/2/2021 Tr. at 9-10, 18, 27). The Cejnogs testified that the family had moved into Mr. Cejnog's other residence, located at 66-24 Forest Avenue, Ridgewood, New York 11385. (2/2/2021 Tr. at 7). They assert that no one was living in the house at the time the process server claimed to have served a woman who answered the door. (Id. at 7). They also claimed that they specifically recalled that, on that particular night, Mr. Cejnog was traveling out of town to Poland and that his wife and children drove with him to the airport. (Id. at 6-7, 32).

Having considered the testimony of the witnesses, along with the photographic evidence demonstrating service, the Court credits the process server's testimony that he actually effected personal service on a woman who answered the door of the house.[7] Not only did he describe the interior of the hallway, noting that it did not appear as if the house were under construction (1/14/2021 Tr. at 49-51), but he substantiated his claim that he was in that exact location at the time he stated with the photograph **[*23]** of the Howard Beach house, bearing the time and GPS coordinates. (1/14/2021 Tr. at 41, 67). Furthermore, from the photographs, the house appears to be occupied, contrary to the claims that it was not being lived in while the construction was going on. (ECF No. 38-6). The photograph taken on November 7, 2019 at 7:05 p.m. in the evening by the process server clearly shows that there were lights on throughout the house on both the first and second stories, which does not seem consistent with an empty home. Even if the house was undergoing renovations, it is unlikely that the construction was ongoing at 7:05 in the evening or that the workmen, if they were there, would have lights on throughout the house. Moreover, the process server averred that, rather than dropping the Summons and Complaint around the side entry or in a mailbox, he handed it to a woman who opened the front door. (1/14/2021 Tr. at 49).

Having considered all of the testimony, the undersigned found plaintiffs' witnesses to be credible and believes it unlikely that the lights depicted in the photograph would be on at 7:05 p.m. if the house were unoccupied for renovations. There was testimony that another woman lived in **[*24]** a separate apartment in the house and it is possible that the process server left the Summons and Complaint with her, instead of Mrs. Cejnog. (2/2/2021 Tr. at 57-58). However, it strains credulity to believe that the woman who answered the door and accepted the Summons and Complaint never gave it to the Cejnogs or that the Cejnogs never retrieved the mail from the Howard Beach address during the entire time period from November 2019 until June 19, 2020 when Mr. Cejnog claims to have found the papers in connection with the default judgment motion.

Moreover, even if Mr. Cejnog never received the copy of the Summons and Complaint that was personally served on his Howard Beach address, it is unclear how defendants failed to receive notice of this lawsuit since the Summons and Complaint were served in a variety of ways and at different locations, not just through personal service at the Howard Beach address. First, as noted, the evidence shows that plaintiff served both NY Fine Interiors and Interiors & Woodwork through the Secretary of State, at the locations for service designated by defendants. (See ECF No. 45-1, 45-2). Thus, because defendants were registered with the Secretary of State **[*25]** and designated the Howard Beach address as the location for service only for Interiors & Woodwork, defendant NY Fine Interiors was properly served even if there was a defect in the personal service.[8] Although Mr. Cejnog testified that he

[7] Importantly, defendants' witnesses did not appear entirely credible. Although Joanna Cejnog testified that she had not dyed or colored her hair in seven or eight years, plaintiff introduced photos of her from 2019 in which her hair was a markedly different color from her hair as she appeared before the Court on February 2, 2021. (See ECF No. 38-12).

[8] Indeed, it appears from the affidavits of service produced by the New York Secretary of State that service at the Howard

did not regularly retrieve his mail from the Howard Beach address while the home was under construction, this does not invalidate service through the Secretary of State. Nor does it have any impact on Mr. Cejnog's ability to receive mail at his business location in Maspeth. Mr. Cejnog's explanation for not receiving the Summons and Complaint at this other location was that his employees may have picked up the mail and discarded it as junk mail. (2/2/2021 Tr. at 37; see also 1/14/2021 Tr. at 6 (Mr. Cejnog "just may have missed it in his busy life and his busy schedule")). The Court finds it difficult to believe that anyone could successfully operate a business, where presumably the company received other important mail, and allow any of the employees to randomly discard whatever they deemed to be junk mail. At best it is negligent.

Therefore, as a preliminary matter, having reviewed the affidavits of service, the Court respectfully recommends a finding **[*26]** that service upon both corporate defendants and Mr. Cejnog was proper. Plaintiff demonstrated proof of service in accordance with the Federal Rules and with *N.Y. C.P.L.R. § 308* and *§ 311*. Although defendants claim not to have received actual notice of the lawsuit until plaintiff sent a copy of the default judgment motion in June 2020, defendants do not appear to contest that service of the corporate defendants was properly effectuated through service through the Secretary of State. See, e.g., *Khotovitskaya v. Shimunov, No. 18 CV 7303, 2020 U.S. Dist. LEXIS 44506, 2020 WL 4588345, at *5 (E.D.N.Y. Mar. 10, 2020)*, report and recommendation adopted, *2020 U.S. Dist. LEXIS 78142, 2020 WL 2110716 (E.D.N.Y. May 4, 2020)* (recommending a finding that service was proper despite defendants' contentions that they did not have actual notice of the lawsuit). Thus, this Court has personal jurisdiction over both defendants.

2. Willfulness

Although defendants were properly served and were thus in default, the Court's inquiry does not end there. In determining whether to relieve defendants of the default, the Court must consider whether the default was willful, whether setting it aside would prejudice the adversary, and whether a meritorious defense is presented. *Enron Oil Corp. v. Diakuhara, 10 F.3d at 96*; *Meehan v. Snow, 652 F.2d at 277*.

Turning first to willfulness, there must be "more than mere[] neglect or carelessness." *Aetna Life Ins. Co. v. Licht, 2004 U.S. Dist. LEXIS 21538, 2004 WL 2389824, at *4* (finding defendant's explanations for letting the case **[*27]** "languish" plausible and acceptable). A finding of willfulness does not require that the default occurred due to bad faith, but the default must be the "deliberate and intended consequence of movant's actions." Id. (citing *Gucci Am., Inc. v. Gold Ctr. Jewelry, 158 F.3d 631, 635 (2d Cir. 1998)*). "Conduct may be found to be willful where it is egregious, not satisfactorily explained, or is rationalized by flimsy excuse." Id.

The test for willfulness is not simply whether defendants were properly served and failed to respond. Instead, the relevant inquiry for determining willfulness relates to the defaulting party's actions after it became aware of the existence of the litigation or entry of default. *Prestige Capital Corp. v. Fuber LLC, No. 16 CV 9577, 2017 U.S. Dist. LEXIS 88237, 2017 WL 2558803, at *2 (S.D.N.Y. June 5, 2017)* (citing *Swarna v. Al-Awadi, 622 F.3d 123, 142-43 (2d Cir. 2010)*); In re FKF 3, *LLC, 501 B.R. 491, 502 (S.D.N.Y. 2013)* (overturning finding of willful default despite defaulting party's admittance of its awareness of the action, proper service, and failure to respond to motion for default judgment, and stating that failure of defaulting party to enter an appearance until a month after learning of the matter, "while negligent, [did] not rise to level of willfulness").

In Swarna v. Al-Awadi, for example, the Second Circuit found that the district court had improperly granted a default judgment, where the individual defendants appeared in the action to file **[*28]** a memorandum opposing the entry of a default judgment, despite their failure to answer the complaint. *622 F.3d at 142*. Of importance, the Second Circuit, in rejecting the district court's decision to grant a default judgment, noted that defendants retained counsel just one day after receiving the motion for default judgment. Id. The court held that willfulness "requires something more than mere negligence, such as egregious or deliberate conduct." *Id. at 143* (citing *New York v. Green, 420 F.3d 99, 108 (2d Cir. 2005)*). In this case, defendant Cejnog claims that he informed his counsel of the lawsuit on June 19, 2020, immediately following the arrival of the FedEx package containing plaintiff's motion for default judgement. (1/14/2021 Tr. at 5; see ECF No. 28-7). Although the Court finds that defendants were properly served and either had actual notice of this lawsuit or deliberately avoided knowing about it, defendants' counsel was retained on June 19, 2020 - just over three weeks after the plaintiff's motion for default judgment was filed. Like the circumstances in Swarna, here,

Beach house was refused (ECF No. 45-2); the same does not appear to be true of service on NY Fine Interiors in Maspeth. (ECF No. 45-1).

defendants have failed to rebut the presumption of receipt and it appears that service was proper. Although the Court finds defendants' conduct to be clearly negligent, given that **[*29]** defendants "responded promptly after learning of the action," In re FKF 3, *LLC, 501 B.R. at 502*, the Court does not believe this rises to the level of willfulness that would warrant a default, particularly when considering the other factors of merit and prejudice. (See infra at 16-19).

3. Meritorious Defense

In addition to analyzing the willfulness of defendants' conduct, the Court must also consider whether defendants have shown a meritorious defense and whether the plaintiff will suffer prejudice if the default is vacated. To demonstrate a sufficiently meritorious defense, "the defendant need not establish his defense conclusively, but he must present evidence of facts that, if proven at trial, would constitute a complete defense." *Aetna Life Ins. Co. v. Licht, 2004 U.S. Dist. LEXIS 21538, 2004 WL 2389824, at *4*. In other words, the defendant must show that there is some determination to be made by the factfinder. *American Alliance Ins. Co., Ltd. v. Eagle Ins. Co., 92 F.3d 57, 61 (2d Cir. 1996)*. Although the proffered defense "need not be ultimately persuasive at this stage," id., defendants cannot simply assert in a conclusory fashion that they would prevail at trial. *Aetna Life Ins. Co. v. Licht, 2004 U.S. Dist. LEXIS 21538, 2004 WL 2389824, at *4*. Furthermore, in this context, "a defense that the parties were properly paid constitutes a 'meritorious defense.'" *Addison v. Reitman Blacktop, Inc., 272 F.R.D. 72, 81 (E.D.N.Y. 2010)*, citing *Franco v. Ideal Mortg. Bankers, Ltd., No. 07 CV 3956, 2010 U.S. Dist. LEXIS 98916, 2010 WL 3780972, at *3 (E.D.N.Y. Aug. 23, 2010)*.

In his Declaration, Mr. Cejnog disputes plaintiff's claim that he worked 57 hours **[*30]** per week beginning the week ending June 17, 2018 and continuing through the week ending February 10, 2019. (Cejnog Decl. ¶ 7). Mr. Cejnog also disputes plaintiff's claims that he worked Monday through Saturday from 7:00 a.m. to 5:00 p.m. and that he worked an additional 40 hours during the two weeks ending February 24, 2010. (Id.) Mr. Cejnog has attached to his Declaration the NY Fine Interiors' weekly sign-in sheets which he claims the employees sign at the start and at the end of the day. (Id. ¶ 8, Ex. A). According to Mr. Cejnog, plaintiff Criollo appears on these sheets and worked less than the 57 hours per week that he claims to have worked. (Id. ¶¶ 8, 9). The summary of hours prepared by defendants' attorney shows that for the period beginning August 13, 2018 through February 24, 2019, plaintiff worked 1,051 hours, not the 1,408 hours that he claims to have worked. (Id. ¶ 9, Ex. B).

Defendants also point to the Interiors & Woodwork paystub that plaintiff attached to his affidavit, for the two-week period ending August 26, 2018. (Id. ¶ 10 (citing Criollo Aff.,[9] Ex. 1)). Defendants explain that this paystub reflects plaintiff's first paystub because the amount of taxes shown in the **[*31]** column "Current Amount" is the same as the amount of taxes shown in the YTD column. (Id.) The paystub reflects a total of 97 hours worked and not the 114 claimed by plaintiff. (Id.) Defendants further assert that all employees take an hour lunch break, not the half hour claimed by plaintiff, and this is reflected in the summaries shown in Exhibit A. (Id. ¶ 11). Accordingly, bearing in mind the preference of the courts to decide cases on their merits, *Meehan v. Snow, 652 F.2d at 277*, the Court finds that, if true, defendant's asserted defense may be "meritorious."[10] Since there is at least one ground upon which defendants may have suggested a meritorious defense,[11] the Court proceeds to the next prong.

4. Undue Prejudice

The third factor that the Court must consider in determining whether to excuse a default is the prejudice to the plaintiff. Although defendants' failure to act diligently has delayed the resolution of this case, plaintiff has not asserted that setting aside the notation of default against defendants will cause the loss of

---

[9] Citations to "Criollo Aff." refer to the Affidavit of Marco Criollo, ECF No. 17-5.

[10] Plaintiff asserts that defendants "doctored documents" with respect to these records. (Pl.'s Reply at 1). Even if that is the case, it raises a factual dispute that goes to the merits of the case. *American Alliance Ins. Co., Ltd. v. Eagle Ins. Co., 92 F.3d at 61 (2d Cir. 1996)* ("A defense is meritorious if it . . . give[s] the factfinder some determination to make").

[11] Additionally, when discussing the meritorious defense prong, some courts have suggested that the question of whether the defendants were "properly served, and thus whether the Court has personal jurisdiction over [them], is an issue of fact, making default judgment inappropriate . . . " *Prestige Capital Corp. v. Fuber LLC, No. 16 CV 9577, 2017 U.S. Dist. LEXIS 88237, 2017 WL 2558803, at *3 (S.D.N.Y. June 5, 2017)*. Prior to the Court's hearing on service, this likely would have weighed in favor of setting aside the default judgment. However, because the Court has found it has personal jurisdiction, this no longer weighs in favor of defendants.

evidence or create increased difficulties for discovery. See *Ward v. Ramkalawan, No. 11 CV 4295, 2013 U.S. Dist. LEXIS 40439, 2013 WL 1149108, at *5 (E.D.N.Y. Feb. 11, 2013)*, report and recommendation adopted, *2013 U.S. Dist. LEXIS 37965, 2013 WL 1149068 (E.D.N.Y. Mar. 19, 2013)* (finding that "delay alone is not a sufficient basis for establishing prejudice"). Moreover, **[*32]** "no obstacles to litigation will result if the default is vacated." Id. That is especially true, here, where there has not been an inordinate delay; defendants appeared immediately after receiving the motion for default judgment, discovery has not yet begun, and both parties will have an opportunity to obtain the necessary evidence to proceed with the case. Moreover, there have been no allegations that witnesses or evidence have been lost during the consideration of this motion.

Having considered the three factors, the Court respectfully recommends that the default be set aside for good cause. See, e.g., *Laffont v. Smarten Media LLC, No. 19 CV 9456, 2020 U.S. Dist. LEXIS 168771, 2020 WL 7232094, at *1 (S.D.N.Y. Sept. 15, 2020)*.

CONCLUSION

Accordingly, the undersigned respectfully recommends denying the motion for default judgment and setting aside the default on the grounds that defendants' default was not willful, defendant presented a potential meritorious defense, and there is no prejudice to the plaintiff beyond mere delay.[12]

Any objections to this Report and Recommendation must be filed with the Clerk of the Court within fourteen (14) days. See *28 U.S.C. § 636(b)(1)*; *Fed. R. Civ. P. 72(b)(2)*; see also *Fed. R. Civ. P. 6(a)*, *(e)* (providing the method for computing time). Failure to file objections within the specified time waives the right to appeal the District Court's order. **[*33]** See, e.g., *Caidor v. Onondaga Cty., 517 F.3d 601, 604 (2d Cir. 2008)* (explaining that "failure to object timely to a . . . report [and recommendation] operates as a waiver of any further judicial review of the magistrate [judge's] decision").

The Clerk is directed to send copies of this Report and Recommendation to the parties either electronically through the Electronic Case Filing (ECF) system or by mail.

**SO ORDERED.**

Dated: Brooklyn, New York

March 3, 2021

/s/ Cheryl L. Pollak

Cheryl L. Pollak

Chief United States Magistrate Judge

Eastern District of New York

---

**End of Document**

[12] With respect to the parties' request to file post-hearing briefs, the parties were given time to supplement the record. The Court denies this request and issues its Report and Recommendation herein. To the extent that the parties wish to submit papers in connection with plaintiff's request for fees and costs associated with this motion and hearing, plaintiff's papers are due March 12, 2021; defendant's response is due March 19, 2021.

# *Stewart v. Stocker*

Supreme Court of Pennsylvania, Western District, Pittsburg

September 12, 1825, Decided

No Number in Original

**Reporter**

13 Serg. & Rawle 199 *; 1825 Pa. LEXIS 94 **

STEWART against STOCKER.

**Prior History:** **[**1]** IN ERROR.

ERROR to the Court of Common Pleas of Allegheny county, in an action of assumpsit for money had and received, &c. brought in that court by John C. Stocker, defendant in error, plaintiff below, against Lazarus Stewart, plaintiff in error. In the court below judgment was rendered in favour of the plaintiff, Stocker.

Stewart was the late sheriff of that county, and the plaintiff Stocker having lately obtained a judgment against Anthony Beelen and Henry Bosler, joint merchants trading under the firm of Beelen & Co. for the sum of five hundred and sixty-five dollars and thirty-three cents, issued a fieri facias thereon and delivered the same to the defendant, then sheriff. Previous to this a fieri facias for the Bank of Pittsburg, against Beelen & Co. had been put into the hands of the defendant with orders to levy on the personal property of Beelen & Co. A levy was accordingly made on the personal property which was sold. The plaintiff afterwards applied to the Court of Common Pleas, from which both executions had issued, and obtained a rule on the Bank of Pittsburg to show cause why their execution should not be quashed. This rule appeared to be still depending or, **[**2]** at least, it did not appear that the court had either dismissed or made it absolute. The plaintiff supposing that the execution for the bank was illegally issued, and therefore that he had a right to the money raised by the sale of the goods of Beelen & Co. which had never been paid over by the defendant, brought this action for the recovery of it.

The authority under which the execution for the Bank of Pittsburg was issued, was as follows: The defendant gave in evidence a bond from Beelen & Co. to the Bank of Pittsburg in the penalty of ten thousand nine hundred and ten dollars, dated the 23d of April, 1823, with a warrant of attorney to confess judgment thereon, by virtue of which a judgment was entered, on which a fieri facias was issued on the 10th of June, 1823. The condition of the bond was "that if Beelen & Co. should pay to the Bank of Pittsburg the sum of five thousand four hundred and fifty-five dollars with interest from the date, being the amount of eight notes, the first seven being drawn by Beelen & Co., and the last by Henry C. Bosler, discounted in the said bank, all payable at sixty days from their date, (the dates of each note with the endorsers were then specified, **[**3]** ) and should pay all notes given to renew the said notes and each and every of them as required, and save harmless and indemnify the said bank in every respect with regard to the said notes, then the said obligation to be void, otherwise of force." On the back of this bond there was a writing, signed by the endorsers of the notes, certifying that it was at their request and with their approbation that the bond was taken by the bank, and that they held themselves responsible as endorsers, in the same manner as if the bond had not been taken.

The following errors were now assigned upon exception taken to the charge of the court.

1st. The court gave in charge to the jury that the defendant in error having no interest in the judgment or execution of the Bank of Pittsburg against Bosler & Co., might be admitted to impugn and draw into question the judgment, execution and sale on said execution.

2d. That the plaintiff might thus impugn those proceedings and draw their regularity into question, notwithstanding his agent Mr. Poe, had solicited the entry of said judgment and issuing said execution, and prepared and posted up printed advertisements of said sale, and attended and **[**4]** purchased at said sale.

3d. That although the plaintiff, by his attorney, applied to the court from whence the execution issued to set aside said execution, yet he might well impugn all the proceedings on the trial of this action, before any order or decision was made on the said application to the court, and his delay and neglect, in prosecuting this application, did not prejudice him in the present suit.

4th. That the court, issuing said execution, had power to control and direct the plaintiff named therein, as to what

property, real or personal, he should take to satisfy his execution.

5th. That the assent of the defendants, Bosler & Co., to the issuing execution made no difference, for that the creditor, Stocker, might still impeach and disaffirm this proceeding, and that said Stocker might thus impeach and bring into question the whole proceeding, even after his agent, Mr. Poe, had requested and urged the attorney of the Bank of Pittsburg that the said execution should be issued.

6th. That although the sale made by the sheriff on said execution was good, and the purchaser might hold the property purchased on paying the purchase money to the sheriff; yet the **[**5]** defendant, Stocker, might recover the money from the sheriff in this action to his own use, to the exclusion of the execution of the Bank of Pittsburg.

7th. The court charged the jury that, the Bank of Pittsburg could not in law issue an execution and levy on personal property of Bosler & Co., even with the assent of Bosler & Co., until after default had been made by Bosler & Co. in paying off their notes; any injured creditor may draw this into question, although Bosler & Co. do not resist it, and such injured and excluded creditor may recover from the sheriff the money made on the sales.

8th. The court further charged that it is totally immaterial in law, whether one of the indorsers, with the assent of the bank, and with the agreement of Bosler & Co. directed the contested execution to issue; for at the time it issued it could not issue to the prejudice of other creditors, any more than to the prejudice of defendants (Bosler & Co.) themselves.

9th. The court charged, also, that the law watches with the narrowest scrutiny every endeavour by failing men to give preference among their creditors; all preferences are grounds of suspicion, parties benefitted by such preferences **[**6]** will be vigilantly controlled, and regarded with a jealous eye, and is liberal in favour of equalization in the distribution of the funds of insolvents; strict proof is required of all who claim under preferences.

10th. There is also error in the charge of the court, directing the jury to allow in damages the whole of the original judgment of the plaintiff below, with interest upon it from the day of sale. There being in evidence before the court prior uncontested executions to be first satisfied, and also several other executions delivered to the sheriff on the same day, so as to surmount the sums made on the sales, and afford only a dividend among the last named class of executions.

**Disposition:** Judgment reversed.

**Counsel:** Ross and M'Donald, for the plaintiff in error.

1st Error. The first question turns on the right of a debtor to prefer certain of his creditors, and in what form such preference may be given, and on the right of a third person to call in question the proceedings in a judgment to which he was no party. The law permits preferences. An executor may confess judgment to one in preference to another, and plead that judgment in bar, 1 Vez. 212, 213. Went. off. Ex. 143. An individual **[**7]** may apply his property by way of judgment or mortgage, or by way of conveyance, to the payment of one creditor in preference. *Wilt v. Franklin, 1 Binn. 502*. *Lippincott v. Barker, 2 Binn. 186*. There is great difference in debts, and preferences are in strict conformity with morality and justice. If A. confesses judgment to B., with stay of execution for six months, A. may prefer B. by relinquishing the stay of execution, so that execution may issue immediately. But can a third person draw into question the proceedings in an action between A. and B? None but the defendant can question the irregularity of an execution. A judgment in one court cannot be impeached collaterally in another court. *Hiester v. Fortner, 2 Binn. 40*. *Allison v. Rankin, 7 Serg. & Rawle 271*. *Lewis v. Smith, 2 Serg. & Rawle 155, 161, 162*. Shirley v. Wright, 2 Lord Raym. 775, Salk. 273. The same principle is decided in *3 Johns. 20*. *5 Johns. 53*. *8 Johns. 284*. In this case the plaintiff moved to set aside the execution for the bank, which was the proper course. This motion, however, he did not prosecute, but brought this suit.

2d Error. If the plaintiff's agent requested a sale on this execution, the plaintiff is bound **[**8]** by it, and cannot afterwards question it.

3d Error. The plaintiff having moved the court to set aside the execution, could not resort to an action.

4th Error. The court charged that this execution could not legally issue even with the consent of the defendants, Beelen & Bosler, and that the parties in this suit might take advantage of it, but we say the execution issued legally. Judgment was confessed for five thousand four hundred and fifty-five dollars, with interest from the date; no time of payment mentioned, no stay of execution. They cited on this point, *Lisle v. Ducomb, 5 Binn. 585*.

9th Error. The court charged that preferences were to be viewed with a jealous eye, and strict proof insisted on.

10th Error. The court charged that the plaintiff should recover his whole debt, with interest from the term of sale. But if the sheriff received the money, he could not pay it while there was a rule to show cause why the execution should not be set aside, and if he did not receive it, he certainly could not be chargeable with interest.

Although the notes to secure payment of the amount of which the bond was given were not due when the execution issued, that is immaterial; because **[**9]** the intent was to confess judgment, with power of issuing execution immediately, and the execution was not issued without the consent of the defendant. Further, the notes were merged in the bond, and execution might issue immediately. And the writing of the same date, signed by Poe, and others, proves that this was the understanding of the parties.

Baldwin and Fetterman, contra. We deny that the notes were merged in the bond: the sum of five thousand four hundred and fifty-five dollars was more than was due, unless the discount is included. The bank having taken the bond to secure the payment of the notes, could not take out execution until default was made in payment of the notes. In fact the notes were renewed after taking the bond, and the writing signed by Poe and others, indorsed on the bond, shows that it was intended the notes should be renewed. No agreement of Beelen & Bosler could justify an execution to the prejudice of other creditors: though we do not deny that a debtor has a right to prefer any creditor he pleases. The record does not show that the bank of Pittsburg takes any interest in this suit, and we say they have no interest. It is stated in the charge of the **[**10]** court that the execution was not issued by order of the bank.

The court left it to the jury to decide whether the defendants in the execution acquiesced in it. But we admit they also said that such acquiescence was immaterial. Bosler & Co. had no right to take out this execution to answer their own purposes, which is the truth of the case.

But it is questioned whether the plaintiff, in this suit, can take advantage of the irregularity in the execution of the Bank of Pittsburg. The plaintiff issued his execution, and demanded from the sheriff the money which he has levied. How, otherwise than by an action, could the plaintiff have his right to the money levied by the sheriff, decided?

As to interest, what the court said was, that the money being in the hands of the purchasers, interest should be paid.

**Judges:** TILGHMAN, C. J.

**Opinion by:** TILGHMAN

## Opinion

**[*203]** The opinion of the court was delivered by

TILGHMAN, C. J. The plaintiff says, that the execution was issued before the notes fell due, and therefore it was irregular and void. We know nothing of the evidence given on the trial of the cause, except what is mentioned in the charge of the court, to which the counsel for the defendant **[**11]** took a number of exceptions.

The great objection to the plaintiff's action, and indeed, it seems to me to be insuperable, is, that it calls in question the **[*204]** validity of an execution issued on a judgment in a court of competent jurisdiction. The judgment on the bond of *Beelen & Co.* to the Bank of *Pittsburg* was regular; nor does the warrant of attorney, by virtue of which it was entered, make any mention of a stay of execution. The execution was not void. The most that can be said against it, is that it was irregular and erroneous. If erroneous it might have been reversed on a writ of error, or the Court of Common Pleas might have inquired into the matter, in a summary way, and quashed it. But without resorting to either of these remedies, the plaintiff has undertaken to invalidate it collaterally, in this action. This is against all principle. The execution until quashed or reversed, is good. The sheriff was bound to obey it, and the execution of the bank, having come first to his hands, had a preference. If two executions are delivered to the sheriff, one after the other, the one first delivered has the preference, and if the sheriff pays the money to the plaintiff **[**12]** in the last execution, the other may maintain an action against him. In that action, the court will inquire into the fact, which execution came first to the sheriff's hand; but no inquiry is permitted, which might tend to the invalidating of either execution, on the ground of error, or irregularity. It was decided by this Court, in *Lewis v. Smith, (2 Serg. & Rawle 142,)* that a judgment erroneously entered, is valid, until reversed. And the same principle extends to an execution. It would make strange confusion, if an execution issued by a court of competent jurisdiction, and unreversed, could be

investigated and treated as a nullity in another court. To this rule there is one exception, and that is, where a judgment is entered by collusion between the defendant and plaintiff, in fraud of a third person. For instance, if an executor confesses judgment where no debt was due, with a view of defrauding other creditors, there an action being brought by one of the other creditors, if the judgment be pleaded in bar, the plaintiff may reply that it was confessed by fraud. The same principle was established, on great consideration, in the Dutchess of *Kingston's* case, where a decree **[**13]** of the Ecclesiastical Court was impeached on the ground of fraud. But there is no question of fraud upon this record. No matter of fraud was submitted to the jury. The plaintiff complains, that the execution for the Bank of *Pittsburg*, was issued before the debt on the promissory notes, to secure the payment of which the bond was given, became due. I shall intimate no opinion on that question--but if the plaintiff has been injured by an improper use of the process of the Court of Common Pleas, that court may do him justice by quashing the execution; and if there should be contested facts which the court does not think proper to decide, it may direct an issue for that purpose. There is no weight in the objection made by the counsel for the defendant, that the plaintiff was not a party to the suit between the Bank of *Pittsburg*, and *Beelen & Co.* There are many instances **[*205]** in which courts will permit a third person, who has been injured by their proceedings, to appear and assert his rights.

There was another exception to the charge of the court, on which it may be proper to give an opinion. The court charged, that if the verdict should be for the plaintiff, he would **[**14]** be entitled to interest from the time the sheriff sold the goods of *Beelen & Co.*, because the purchasers of these goods had not paid for them, and, therefore, they ought to pay interest to the sheriff. In this respect, I think the charge was incorrect. The action is not against the purchasers, but the sheriff; and the declaration avers that the sheriff received the money. Now suppose the money is in the hands of the sheriff, (which the plaintiff is bound to suppose,) it was tied up by the rule of court, to show cause why the execution of the bank should not be quashed. The sheriff could not pay the money to either party, till that rule was disposed of; and consequently he cannot be liable to the payment of interest, which is never demandable unless money is unlawfully withheld.

I am of opinion, upon the whole, that the judgment should be reversed.

Judgment reversed.

---

**End of Document**